CORREEN FERRENTINO
SBN 172485
FERRENTINO & ASSOCIATES, INC.
600 West Santa Ana Blvd, Suite 925
Santa Ana, CA 92701
Telephone: 714-973-2024
Facsimile: 714-973-2025
E-Mail:  cori@ferrentinolaw.com

KARREN KENNEY, SBN 174872
575 Anton Blvd., 3rd Floor
Costa Mesa, CA 92626
Telephone: 714-504-5588
E-Mail:  karren.kenney@gmail.com

Attorneys for Defendant *Safieh Fard*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> SAFIEH FARD, <br><br> Defendant. | Case: SACR 07-52-CJC <br><br> DEFENDANTS OBJECTIONS TO PSR AND MEMORANDUM AND POSITION WITH RESPECT TO SENTENCING <br><br> Sentencing Date: May 13, 2013 <br> Hearing Time: 1:30 |

TO THE HONORABLE CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE, THE UNITED STATE ATTORNEY'S OFFICE AND ITS ATTORNEYS OF RECORD, ERIN MELLEN AND MARK WILLIAMS:

Defendant SAFIEH FARD, by and through her counsel of record, CJA Panel Attorney Correen Ferrentino, hereby files this sentencing memorandum in the above-entitled matter. Ms. Fard's position is based upon the attached memorandum of points and authorities, the files and

records in this case, the United State Probation Office's Presentence Report, and any other evidence or argument presented at sentencing. Ms. Fard respectfully reserves the right to supplement this memorandum if additional information becomes known.

DATED: April 30, 2013                     Respectfully submitted,


                                          s/Correen Ferrentino
                                          CORREEN FERRENTINO

                                          s/Karren Kenney
                                          Karren Kenney



                                          *Attorney for Defendant FARD*

Defendant's Sentencing Position Memorandum

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES.................................................................. iii

   I. INTRODUCTION................................................................ 1

  II. PROCEDURAL BACKGROUND.................................................. 2

III. STATEMENT OF FACTS........................................................ 3

IV. PRESENTENCE REPORT........................................................ 3

    *Offense Level*................................................................. 3

    *Criminal History Category*.................................................. 5

    *Probation Recommendation*.................................................. 5

V.  FARD'S POSITION WITH RESPECT TO AN APPROPRIATE SENTENCE......... 6

   A. The Guideline Range Provides No Useful Advice Because It Is
      Not Based on Empirical Evidence Or National Experience, And
      Fails to Promote Any Purpose of Sentencing................................ 6

   B. Additional Levels Were Added for the Amount of Loss In this
      Case Without Basis in Empirical Data or National Experience
      and Without Any Demonstrated Need to Further Any Purposes
      of Sentencing................................................................ 7

      1. "Loss" is not always an appropriate factor to base sentence
         upon.................................................................. 8

   C. The Nature and Circumstances of the Offense and
      Characteristics of Ms. Fard................................................ 15

      1. Circumstances of the Offense............................................ 15

      2. Characteristics of Ms. Fard............................................. 16

         *Acceptance of Responsibility*............................................ 16

         *Family Background*...................................................... 17

         *Employment and Education*.............................................. 19

         *Mental and Physical Condition*.......................................... 20

         *Substance Abuse*........................................................ 20

   D. Seriousness of the Offense, Respect for the Law, and Just
      Punishment................................................................ 20

   E. Deterrence of Criminal Conduct........................................... 22

iii

TABLE OF CONTENTS
(Continued)

Page

F. Need to Protect the Public.............................................................. 24

G. Prospect of Rehabilitation............................................................. 26

H. Available Sentences in this Case.................................................... 27

I. Need to Avoid Sentence Disparities............................................. 27

J. The Need to Provide Restitution in this Case............................... 29

VI.  A VARIANCE IS WARRANTED IN THIS CASE........................................ 29

VII. THE MINIMALLY-SUFFICIENT SENTENCE IN THE CASE...................... 31

VIII. CONCLUSION............................................................................. 32

CERTIFICATE OF SERVICE

Defendant's Sentencing Position Memorandum

1

2 **T**ABLE OF AUTHORITIES

3 **CASES**                                                          **PAGE**

4
5 *Gall v. United States*
    552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 445 (2007).................. 7, 27, 28

6 *Kimbrough v. United States*
7     552 U.S. 85, 128 S. Ct. 558, 169 L. Ed. 481  (2007)........................... 7

8 *Pepper v. united States*
9     ___ U.S. ___, 131 S. Ct. 1229, 179 L. Ed. 2d 196 (2011)....................... 13

10 *Rita v. United States*
11 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007).......... 6 , 7, 31

12 *Simon v. United States*
13     361 F. Supp. 2d 35 (E.D.N.Y 2005).................................... 26

14 *Spears v. United States*
15     555 U.S. 261, 129 S. Ct. 840, 172 L. Ed. 2d 596 (2009)..................... 7

16 *United States v. Adelson*
17     441  F. Supp. 2d  506 (S.D.N.Y. 2006)........................................ 9, 30

18 *United States v. Allison*
19     86 F.3d 940 (9th Cir. 1996)................................................. 9

20 *United States v. Booker*
21     543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 621 (2005)..................... 1, 11

22 *United States v. Cabrera*
23     567 F. Supp. 2d 271 (D. Mass. 2008)................................. 26

24 *United States v. Cantrell*
25     433 F.3d 1269 (9th Cir. 2006)........................................... 12

26 *United States v. Crandall*
27     525 F.3d 907 (9th Cir. 2008)............................................. 8

28

# TABLE OF AUTHORITIES
## (Continued)

**CASES**                                                         **PAGE**

*United States v. Darway*
    255 Fed App'x 68 (6th Cir. 2008)......................................... 25

*United States v. Davis*
    2008 WL 2329290 (S.D.N.Y 2008)..................................... 22

*United States v. Edwards*
    593 F. 3d 1004 (9th Cir. 2010.)......................................... 22

*United States v. Flores*
    959 F.2d 83, (8th Cir. 1994)............................................. 15

*United States v. Hadash*
    408 F.3d 1080 (8th Cir 2005)........................................... 22

*United States v. Hamilton*
    323 Fed. Appx. 27 (2nd Cir. 2009)................................... 25

*United States v. Holt*
    486 F.3d 997 (7th Cir. 2007)............................................ 25

*United States v. Howe*
    543 F.3d 128 (3rd Cir 2008. )........................................... 22

*United States v. Lauersen,*
    362 F.3d 160 (2nd Cir. 2004)........................................... 29

*United States v. Nellum*
    2005 WL 300073 (N.D. Ind. Feb. 3, 2005)....................... 26

*United States v. Ovid*
    2010 WL 3940724 (E.D.N.Y Ind. Oct. 1, 2010)................. 28

*United States v. Parris*
    573 F. Supp. 2d 744 (E.D.N.Y. 2008)...................... 28, 29, 30

Defendant's Sentencing Position Memorandum

# TABLE OF AUTHORITIES
### (Continued)

**CASES**                                                              **PAGE**

*United States v. Stoddard*
    150 F. 3d 1140 (9th Cir. 1998)....................................................  9

*United States v. Urbina*
    2009 WL 565485 (E.D. Wisc. Mar. 5,  2009)....................................  26

*United States v. Ward*
    814 F. Supp 23 (E.D. VA 1993)...................................................  26

*United States v. Watt*
    707 F. Supp. 2d 149 (D. Mass 2010).........................................  30

*United States v. Zavala*
    443 F. 3d 1165 (9th Cir. 2006)...............................................  12

*United States v. Zolp*
    479 F. 3d 715 (9th Cir. 2007)................................................  8


**FEDERAL STATUTES AND RULES**

**18 U.S.C.**

    §371..............................................................................  2
    §1344....................................................................  3, 28, 29
    §1956(h)................................................................  1, 2, 3, 5
    §3553 (a)...............................................................  1, 6, 7, 14
    §3553(a)(2)..................................  13, 14, 21, 22, 23, 26, 31
    §3553(a)(3)....................................................................  27

**28 U.S.C.**

    §991...........................................................................  6
    §994........................................................................  6, 27
    §995...........................................................................  6

Defendant's Sentencing Position Memorandum

# TABLE OF AUTHORITIES
## (Continued)

**FEDERAL STATUTES AND RULES**                              PAGE

### U.S.S.G.

§2A1.3...................................................................................  8

§2A2.1...................................................................................  8

§2A4.1...................................................................................  8

§2B1.1........................................................................... 3, 5, 7, 8

§2D1.1...................................................................................  7

§2k1.4...................................................................................  8

§2S1.1...................................................................................  3

§3B1.1.............................................................................. 3, 5

§3D1.2...................................................................................  3

§E1.1............................................................................ 3, 16, 17

§5H1.1................................................................................  25

Ch. 1 Pt. A(3)........................................................................  6

App. C, Amend. 653 (Nov. 1, 2003)............................................ 9, 10

### Rules of Criminal Procedure

Rule 29..................................................................................  2

Rule 33..................................................................................  2

### SECONDARY SOURCES

Frank O. Bowman III, *Pour Encourager Les Autres?*, 1 Ohio State
  J. Crim. L. 373 (2004)............................................................  9

Frank O. Bowman III, *Sentencing High-Loss Corporate
  Insider Frauds After Booker*, 20 Fed. Sent. R. 167, 170,
  2008 WL 2201039 (Feb. 2008)....................................... 10, 11, 30

Justice Stephen Breyer, *The Federal Sentencing Guidelines and
  the Key Compromises Upon Which They Rest*, 17 Hofstra L.
  Rev. 1 (1988)........................................................................  6

Defendant's Sentencing Position Memorandum

**T**ABLE OF AUTHORITIES
(Continued)

**SECONDARY SOURCES**                                    **PAGE**

Justice Stephen Breyer, Federal Sentencing Guidelines Revisited,
11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11
(1999)....................                                          12

Samuel W. Buell, *Overlapping Jurisdictions, Overlapping Crimes,
Reforming Punishment of Financial Reporting Fraud*, 28
Cardozo L. Rev. 1611 (2007)...........................................   11

Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The
High Cost of Ignoring Science*, 91 Prison J. 48S, (2011)..............  23

Alan Ellis, John R. Steer, Mark Allenbaugh, *At a "Loss" for
Justice: Federal Sentencing for Economic Offenses*, 25
Crim. Just. 34 (2011)...............................................  11, 15

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals,
and the Eighth Amendment: "Proportionality" Relative to
What?*, 89 Minn. L. Rev. 571 (February 2005)...........................  21

Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime
& Just. 1 (2006)...............................................  23

Andrew von Hirsch et al., *Criminal Deterrence and Sentence
Severity: An Analysis of Recent Research* (1999)......................  23

*David Weisburd et al., Specific Deterrence in a Sample of
Offenders Convicted of White Collar Crimes*, 33 Criminology
587 (1995)...............................................  23

U.S. Sent'g Comm'n, *Recidivism and The "First Offender,"* 8
(2004)...............................................  24

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal
History Computation of the Federal Sentencing
Guidelines* (May 2004)...........................................  28, 30

U.S. Sent'g Comm'n, *2012 Sourcebook of Federal Sentencing
Statistics*...............................................  28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

#### INTRODUCTION

Safieh Fard respectfully submits this memorandum in order to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. §3553(a) in light of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 621 (2005) (*Booker*). Given the circumstances of the offense, Ms. Fard's extraordinary background, and the need for her to care for her 94-year-old mother whose health is greatly deteriorating, Ms. Fard respectfully requests a sentence of probation with some period of home confinement, followed by three years of supervised release. Ms. Fard objects to probation's request for 108 months in its recommendation letter based on an offense level of 31.

Instead, Ms. Fard requests the court find an adjusted offense level of 9 after finding a base offense level of 7, plus two levels for a managerial role, and another two levels for a conviction under 18 USC 1956(h), and then applying a two level reduction for acceptance of responsibility. This would correspond to a sentencing guideline range of 4-10 months. Ms. Fard disagrees with probation's adjusted offense level of 31 because the Citibank loss occurring after the filing of the Indictment was not the product of mortgage fraud, but rather a rapidly depreciating real estate market. Further, she did not derive more than $1 million in gross receipts individually, did not use sophisticated means, and did show acceptance of responsibility. Furthermore, the guideline range recommended by probation, 108-135 months, was not developed based on empirical data or national experience, and is "far greater than necessary" to satisfy any purpose of sentencing.

Defendant's Sentencing Position Memorandum

As set forth below, the seriousness of Ms. Fard's offenses is substantially mitigated and there is no need to further incapacitate her to prevent her from committing further crimes, given her extraordinarily low risk of recidivism. The convictions in this case represent an utter aberration in the life of Ms. Fard – a woman whose "personal history and characteristics" are dramatically different from those routinely charged in white collar cases. Ms. Fard's extraordinary life story is of a teenage immigrant mother raising four children in a foreign country who goes on to learn English, educate herself and her children, and devotes practically all of her time to charitable efforts and caring for others. A life defined by helping others and one fundamentally at odds with the events of this case.

## II.

### PROCEDURAL BACKGROUND

The Government alleged by way of indictment that Ms. Fard conspired with her co-defendants to defraud the government [Count 1: 18 U.S.C. §371] and conspired with her codefendants to launder money obtained by committing bank fraud [Count 2: 18 U.S.C. §1956(h)]. Jury trial began on November 6, 2012. On November 21, 2012, the day before Thanksgiving and after nine full days of testimony, the jury heard closing arguments. The jury began deliberations on Thanksgiving eve at 2:30 p.m. and returned a verdict of guilty on both counts after only three hours of deliberations.

On March 26, 2013 Ms. Fard filed a motion to set aside verdict and for a new trial pursuant to Federal Rule of Criminal Procedure §§29 and 33. The matter is currently set for sentencing and hearing on the Rule 29 and Rule 33 motion on May 13, 2013 before this honorable court.

Defendant's Sentencing Position Memorandum

# III.

## STATEMENT OF THE FACTS

This court, having heard the evidence, is familiar with the facts here. Counsel will cite to the facts where relevant in the subsequent arguments on Ms. Fard's behalf.

# IV.

## PRESENTENCE REPORT

### *Offense Level*

The Presentence Report (PSR) sets forth the following offense level calculations:

| | | |
|---|---|---|
| Base Offense Level: | 7 | [U.S.S.G. §2B1.1(a)(1)] |
| Loss Exceeding $1 million | +16 | [U.S.S.G. §2B1.1(b)(1)(I)] |
| Sophisticated Means | +2 | [U.S.S.G. §2B1.1(b)(10)(C)] |
| Gross Profits Exceeding $1 million | +2 | [U.S.S.G. §2B1.1(b)(15)(A), (D)] |
| **Adjusted Offense Level:** | **27** | |
| Specific Offense Characteristics: | +2 | [U.S.S.G. § 2S1.1(b)(2)(B)] |
| Role in the Offense | +2 | [U.S.S.G. § 3B1.1] |
| Acceptance of Responsibility: | -0 | [U.S.S.G. § 3E1.1] |

_____

**Total Offense Level:          31**

The PSR states that Counts 1 and 2 are grouped together for the purposes of calculating the base offense level because the conduct in Count 1 is a specific characteristic of Count 2 pursuant to U.S.S.G §3D1.2(c). Ms. Fard agrees with probation's analysis and recommendation regarding grouping Counts 1 and 2.

Pursuant to U.S.S.G §2S1.1, the section applied to violations of 18 U.S.C. §1956(h), the predicate offense, in this case bank fraud (18 U.S.C. §

Defendant's Sentencing Position Memorandum

1344), provides the base offense level. Here, according to U.S.S.G. § 2B1.1 (a)(1), the guideline applicable to bank fraud, base level of 7 is applicable. Fard agrees with this calculation. (PSR ¶ 35-36.)

When the alleged loss is more than $1 million, but less than $2.5 million a 16-level increase is warranted under U.S.S.G § 2B1.1 (b)(1)(I). (PSR ¶ 37.) The loss is the greater of actual or intended loss, minus any money returned. (PSR ¶ 37.) According to probation, although all of the WAMU loans associated with Ms. Fard and her co-defendants were repaid in full, Citibank suffered a loss of $1,157,640.10 due to Ms. Fard's fraudulent conduct. (PSR ¶ 38.) Therefore, probation applied the 16-level increase, making Ms. Fard's base offense level 23. (PSR ¶ 38.) Ms. Fard objects to this offense level increase because Citibank did not suffer any loss due to mortgage fraud or any intended loss on the part of Ms. Fard but instead due to the economic crisis

In addition, probation calculated a 2-level increase under U.S.S.G. §2B1.1(b)(10)(C) because it considered Ms. Fard's conduct to be of sophisticated means. (PSR ¶ 39.) According to probation Ms. Fard directed three people to submit fraudulent loan applications, transfer properties back and forth between themselves and undertake separate transactions. Also, multiple cashier's checks were cashed in an attempt to hide proceeds of the crime. (PSR ¶ 39.) Ms. Fard objects to this enhancement as the conduct did not involve complex or intricate means and Fard did not use fictitious entities to hide her conduct.

Because probation believed Ms. Fard received $4.3 million in gross receipts from controlling all of the properties at issue, it applied a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(15)(A). (PSR ¶ 40.) Ms. Fard disagrees with this enhancement as she did not individually receive more than $1 million in gross receipts.

Additionally, in considering the specific offense characteristics, probation included a 2-level increase because Ms. Fard was convicted of violating 18 U.S.C. § 1956(h). (PSR ¶ 41.)

A 2-level adjustment for Ms. Fard's role in the offense was further applied under U.S.S.G. §3B1.1, because Ms. Fard was believed to be a leader, organizer, or manager in a criminal activity that did not involve five or more people or was not otherwise extensive. Here, according to probation, Fard oversaw a fraud scheme involving multiple properties and controlled the activities of her two sons and sister. (PSR ¶ 44-45.)

Based on the foregoing increases and enhancements, probation determined that Ms. Fard's total offense level was 31 with a corresponding sentencing range of 108 to 135 months. (PSR ¶ 4.)

*Criminal History Category*

In the PSR, probation calculates a criminal history category of I for Ms. Fard. (PSR ¶ 33)

*Probation Recommendation Letter*

In its Probation Recommendation Letter (PRL), probation calculated an offense level of 28 and a criminal history category of I. It recommended a term of 78 months, comprised of a term of 60 months for Count 1, and 78 months for count 2 to be served concurrently. (*See* PRL p. 1.)

///
///
///

Defendant's Sentencing Position Memorandum

# V.

## FARD'S POSITION WITH RESPECT TO AN APPROPRIATE SENTENCE

**A.    The Guideline Range Provides No Useful Advice Because It Is Not Based On Empirical Evidence Or National Experience, And Fails To Promote Any Purpose Of Sentencing.**

When Congress enacted the Sentencing Reform Act of 1984, it directed the Commission to promulgate guidelines that "assure the meeting of the purposes of sentencing," (28 U.S.C. §991(b)(1)(A)), and to use average sentences imposed and prison time actually served in the pre-guidelines period as a "starting point." (28 U.S.C. §994(m). The Commission was then to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system. (*See* 28 U.S.C. §991(b)(1)(C), §991(b)(2), §994(o), §995(13), (15), (16).) The original Commissioners abandoned the effort to design the guidelines based on the purposes of sentencing because they could not agree on which purposes should predominate, and instead purportedly based the guidelines on an empirical study of time served for various offenses before the guidelines. (*See* USSG, Ch. 1 Pt. A(3); Justice Stephen Breyer, The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest, 17 Hofstra L. Rev. 1, 7 (1988).)

In *Rita v. United States*, 551 U.S. 338, 127 S. Ct. 2456, 168 L. Ed. 2d 203 (2007) (*Rita*), the Supreme Court gave two reasons that it may be "fair to assume" that the guidelines "reflect a rough approximation" of sentences that "might achieve §3553(a)'s objectives." First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past." Second, the Commission can review and revise the guidelines based on

Defendant's Sentencing Position Memorandum

judicial feedback through sentencing decisions, and consultation with other frontline actors, civil liberties groups, and experts. *Rita*, *supra*, at 348-50. The Court recognized, however, that not all guidelines were developed in this manner. (*See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 169 L. Ed. 445, 46 & n.2 (2007); *Kimbrough v. United States*, 552 U.S. 85, 96, 128 S. Ct. 558, 169 L. Ed. 481 (2007) (*Kimbrough*).) When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, *supra*, at 109-10.

The fraud guideline is not based on empirical data of past practice or on national experience. And because the Commission failed to rely on empirical data or national experience in promulgating or amending §2B1.1, and thus failed to fulfill its institutional role, this Court is free to disagree, on reasoned policy grounds, with its recommendation. (*See Spears v. United States*, 555 U.S. 261, 264, 129 S. Ct. 840, 172 L. Ed. 2d 596 (2009); *Kimbrough*, 552 U.S. 101-02, 109-10; *Rita*, 551 U.S. at 351, 357.)

**B.     Additional Levels Were Added for the Amount of Loss in this Case Without Basis in Empirical Data or National Experience and Without Any Demonstrated Need to Further Any Purpose of Sentencing.**

The 1989 and 2001 increases in the fraud guideline led to the absurd result that first-time nonviolent fraud offenders were subject to guideline ranges as high as those imposed on armed drug traffickers and even higher than those applicable to the most violent offenders. Compare USSG §2B1.1 (2001) (offense level 30 for loss over $7 million, sophisticated means, abuse

7

of position of trust) with USSG  2D1.1 (2001) (offense level 30 for trafficking in 3 kilograms of cocaine while possessing a firearm); USSG §2A2.1 (2001) (offense level 28 for assault with intent to commit first degree murder); §2A4.1 (2001) (offense level 24 for kidnapping), USSG §2K1.4 (2001) (offense level 24 for arson creating substantial risk of death or serious bodily injury), USSG §2A1.3 (2001) (offense level 25 for voluntary manslaughter).

### 1.    "Loss" is not always an appropriate factor to base a sentence upon.

The Sentencing Guidelines permit downward departure. (USSG section 2B1.1, cmt.n.19(C) states:

> Downward Departure Consideration—there may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."

Specifically, the amount of "loss" must be reviewed, and a downward departure should occur if the circumstances warrant.

In *U.S. v. Crandall*, 525 F.3d 907, 912  (9th Cir. 2008), "[u]nder U.S.S.G. §2B1.1(b)(1), if a crime involving fraud resulted in a loss of more than $5000, the base offense level is increased depending on the amount of actual or intended loss, whichever is greater. *See* U.S.S.G. §2B1.1 cmt. n.2(A). "The guidelines do not present a single universal method for loss calculation under §2B1.1--nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). For that reason, "§2B1.1 is not to be applied mechanically in valuing loss" and sentencing courts are instructed to "'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the

monetary loss.'" *United States v. Stoddard*, 150 F.3d 1140, 1145-46 (9th Cir. 1998) (quoting *United States v. Allison*, 86 F.3d 940, 943 (9th Cir. 1996))."

Moreover, while the amount of "loss" is the primary determinant of the offense level for fraud offenders, loss is a highly imperfect measure of the seriousness of the offense. *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness…or the need for deterrence (*Id.*).

In 2003, the base offense level was increased from six to seven for defendants convicted of an offense with a statutory maximum of 20 years. *See* USSG App. C, Amend. 653 (Nov. 1, 2003). The Sarbanes-Oxley Act had raised statutory maximums for most fraud offenses after a "bidding war" in Congress. *See* Frank O. Bowman III, Pour Encourager Les Autres?, 1 Ohio State J. Crim. L. 373, 404 (2004) (Bowman). Thus, the one-level increase resulted in a 10% increase for most fraud offenders, including Ms. Fard.

As its stated reason, the Commission pointed to Congress's directive in section 905(b)(2) of the Sarbanes-Oxley Act, Pub. L. No. 107-204, which instructed it to consider whether the guidelines are "sufficient to deter and punish" certain economic crimes "in view of the statutory increases in penalties contained in the Act." (*See* USSG App. C, Amend. 653 (Nov. 1, 2003) (Reason for Am Amendment). Having just substantially raised penalties in 2001, the Commission could have narrowly targeted the high-end corporate scandals that prompted the Sarbanes-Oxley Act. That is what all commentators (other than the Department of Justice) advised, and the empirical evidence showed that across-the board-increases were

Defendant's Sentencing Position Memorandum

unnecessary. The Department of Justice, however, placed intense pressure on the Commission to raise sentences for all fraud offenders, privately threatening to go back to Congress for a more specific directive if the Commission did not comply with the Department's wishes. The Commission initially resisted. But nine months after the Sarbanes-Oxley Act was enacted, one Senator unilaterally inserted into the congressional record a "legislative history" stating that Congress meant the Commission to raise sentences for both high and low-level fraud offenders, with special attention to the "penalty gap" between fraud and narcotics cases. *See* Bowman, *supra*, at 411-32.

Accordingly, the Commission raised the base offense level from six to seven, stating that the amendment "responds to increased statutory penalties" and that the higher base offense level is "intended to calibrate better the base guideline penalty to the seriousness of the wide variety of offenses referenced to that guideline, as reflected by statutory maximum penalties established by Congress." *See* USSG App. C, Amend. 653 (Nov. 1, 2003). In doing so, the Commission once again ratcheted up the fraud guideline to more closely match the unsound drug guidelines and explicitly tied the base offense level to the statutory maximum, thus abdicating to Congress its independent judgment regarding the seriousness of the offense. Bowman, *supra*, at 434. D.

Two of the levels used to calculate Ms. Fard's guideline range come from specific offense characteristics in §2B1.1. This factor is "closely correlated" with loss. (*See* Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After Booker, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *6 (Feb. 2008) (Bowman III.) "In effect, what the Guidelines have done over time is to tease out many of the factors for which loss served

as a rough proxy and to give them independent weight in the offense-level calculus." *Id.*

> "The result is that many factors for which loss was already a proxy not only have been given independent weight but also impose disproportionate increases in prison time because they add offense levels on top of those already imposed for loss itself and do so at the top of the sentencing table where sentencing ranges are wide. . . . Any case involving a corporate officer and a multimillion-dollar fraud will almost always trigger application of multiple offense-level enhancements that have the effect of punishing the defendant over and over for the same basic thing – conducting a big fraud in a corporate setting."

(Bowman III, *supra*, 20 Fed. Sent. R. 167, 170, 2008 WL 2201039, at *7). *See* also Samuel W. Buell, Overlapping Jurisdictions, Overlapping Crimes: Reforming Punishment of Financial Reporting Fraud, 28 Cardozo L. Rev. 1611, 1648-49 (2007) (factors such as sophisticated means and large number of victims "double-count because they are captured by other enhancements or by the loss calculation."); Alan Ellis, John R. Steer, Mark Allenbaugh, At a "Loss" for Justice:  Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37 (2011) ("the loss table often overstates the actual harm suffered by the victim," and "[m]ultiple, overlapping enhancements also have the effect of 'double counting' in some cases," while "the guidelines fail to take into account important mitigating offense and offender characteristics.").)

The Commission has recognized this problem of "factor creep," in which as "more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." (U.S. Sent'g Comm'n Fifteen Year Report at 137 (2004).)

In 1999, Justice Breyer warned that "[t]here is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly

Defendant's Sentencing Position Memorandum

detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of Guideline workability and even in terms of fairness (recall the Guidelines' logarithmic numerical scales)...the precision is false." (*See*, e.g., Justice Stephen Breyer, Federal Sentencing Guidelines Revisited, 11 Fed. Sent'g Rep. 180, 1999 WL 730985, at *11 (1999).)

Ms. Fard respectfully requests this court find a base offense level of 7 then add two levels for a managerial role and two levels for a conviction resulting from 18 U.S.C. 1956 (h). Then, Ms. Fard requests this court apply a two-level reduction for acceptance of responsibility and find an adjusted offense level of 9 and a corresponding sentencing guideline range of 4-10 months. Ms. Fard request this court impose a sentence of probation, and if necessary, order some a period of home confinement followed by 3 years of supervised release. This request is based on the applicable offense level and that in light of *Booker*, the sentencing guidelines are advisory and are but one factor to be considered by the Court in fashioning an appropriate sentence, to wit, a sentence that is "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. Section 3553(a). The Sentencing Guidelines are only a starting point for the Court in crafting a reasonable sentence, and, in the Ninth Circuit, the Sentencing Guidelines carry no presumptive force in the sentencing analysis. *United States v. Zavala,* 443 F.3d 1165, 1171 (9th Cir. 2006); *United States v. Cantrell*, 433 F.3d 1269, 1280 (9th Cir. 2006). *Booker* restored the district court's ability to fashion a sentence tailored to the individual circumstances of the case and the Defendant by requiring courts to consider factors other than the sentencing range and to consider the factors set forth under Section 3553(a).

Defendant's Sentencing Position Memorandum

Perhaps even more important, however, *Booker* establishes a new, independent limit on the sentence that may be imposed. The primary sentencing mandate of §3553(a) states that the Courts must impose the minimally sufficient sentence to achieve the statutory purposes of sentencing and punishment – justice, deterrence, incapacitation and rehabilitation. Section 3553(a) provides that the Court shall impose a sentence *sufficient but not greater than necessary* to comply with the purposes set forth in §3553(a)(2).

The Probation Officer has calculated an advisory guideline range of 108-135 months, resulting from an adjusted offense level of 31 and a Criminal History Category I. The guideline range offers no useful advice because it; (1) is the product of a guideline that is not based on empirical evidence or national experience; (2) fails to take any account of Ms. Fard's unique situation, low risk of recidivism; and (3) is far greater than necessary to promote the goals of sentencing in this case.

In *Pepper v. United States* (2011) 131 S. Ct. 1229, 1239-1240, 179 L. Ed. 2d 196, the court stated:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime. Consistent with this principle, we have observed that both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law. In

Defendant's Sentencing Position Memorandum

particular, we have emphasized that highly relevant--if not essential--to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. Permitting sentencing courts to consider the widest possible breadth of information about a defendant ensures that the punishment will suit not merely the offense but the individual defendant. [citations omitted].

Specifically, 3553(a) provides the court with the following factors in fashioning the appropriate sentence, which are "the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

18 U.S.C. § 3553(a)(2).

In "determining the particular sentence to be imposed," the Court must consider these purposes, the nature and circumstances of the offense and the history and characteristics of the defendant, the need to avoid unwarranted disparities, and the need to provide restitution to any victims of the offense. (*See* 18 U.S.C. §3553(a)(1)–(7).)

"While the fraud guideline focuses primarily on aggregate monetary loss and victimization, it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment, in a particular case."  Allan Ellis, John R. Steer, Mark Allenbaugh, At A "Loss" for Justice: Federal Sentencing for Economic Offenses, 25 Crim. Just. 34, 37 (2011); *See also United States v. Ovid*, slip op., 2010 WL 3940724, *1 (E.D.N.Y. Oct. 1,

2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so."). A substantial variance is needed in this case because of the following mitigating factors, all of which are highly relevant to the purposes of sentencing and none of which is taken into account by the guideline range

## C.    The Nature and Circumstances of the Offense and Characteristics of Ms. Fard

### 1.    Circumstances of the Offense

The offense did not involve violence, coercion, or any other use of force. Private parties and institutions did not suffer a loss in this case. As the PSR notes all of the WAMU loans were repaid in full by Ms. Fard (PSR ¶ 38) and the Citibank loss attributed to Ms. Fard was a consequence of Citibank selling the loan to Lone Star for 62.26 cents on the dollar. (PSR ¶ 26) Ms. Fard attempted to obtain approval from her pretrial services officer to travel to Las Vegas to monitor the property. Ms. Fard's pretrial officer told Ms. Fard to make a request with the Court through her attorneys. Neither of Ms. Fard's previous attorneys Michael Molfetta nor Michael Khouri lodged such a request. Moreover, economic conditions contributed to the loss by causing the property to rapidly decrease in value as testified to by government witness Michael Collins at trial.

The evidence also showed the realized capital gains to be approximately $1.6 million less than purported by the government because in two transactions where $800,000 was paid allegedly to Ms. Fard the evidence showed by way of escrow documents and 1031 exchange paperwork that in fact she received a promissory note and no money from her sister the buyer.

15

Defendant's Sentencing Position Memorandum

### 2. *Characteristics of Ms. Fard*

*Acceptance of responsibility*

A defendant may qualify for a two level decrease in base offense level by accepting responsibility for his offense. U.S.S.G §3E1.1(a). In determining whether a defendant qualifies for this reduction, the court may consider, but is not limited to:

> whether the defendant truthfully admit[ed to] the conduct compromising the offense of conviction; voluntary surrender to authorities promptly after commission of the offense; and the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

U.S.S.G. § 3E1.1 comment. (n. 1).

Whether a defendant has accepted responsibility is a factual question which depends largely on credibility assessments by the sentencing court. *United States v. Flores*, 959 F.2d 83, 87 (8th Cir. 1994); U.S.S.G. §3E1.1 comment. (n. 5).

In this case, Under USSG §3E1.1, Ms. Fard should be given a two level reduction for acceptance of responsibility. Conviction by trial does not automatically preclude a defendant from receiving this reduction. (U.S.S.G. §3E1.1 comment. (n. 2.). This court is entitled to great deference when finding acceptance of responsibility because of its unique position to evaluate Ms. Fard's statements and conduct throughout these proceedings. *Id.* (n. 3). The court should consider various factors, including whether a defendant surrendered, her rehabilitative efforts, and voluntary withdrawal from criminal conduct or associations. *Id.* (n. 1). The reduction for acceptance of responsibility for this conduct recognizes a legitimate societal interest.

Here, Ms. Fard demonstrated her acceptance of responsibility in several important ways. After Ms. Fard met with attorney Perkins, who

Defendant's Sentencing Position Memorandum

provided comprehensive counsel to Ms. Fard regarding all of the convoluted mortgage transactions and advised her of the potential problems and legalities, Ms. Fard ceased from applying for any additional mortgages and disassociated herself with Mina Azariani, the Washington Mutual Broker who facilitated all but one of Ms. Fard and her family's loans. U.S.S.G. § 3E1.1 comment. (n. 1 (D)). She also surrendered to authorities when the Indictment was filed and agreed to go into custody. She appeared in court in custody at her initial appearance. *Id.* (n. 1 (D)). Finally, Ms. Fard voluntarily filed amended tax returns for the years at issue in this case and was willing to pay any taxes due but was informed none are owed at this time by the IRS. *Id.* (n. 1 (G).)

*Family Background*

 Ms. Fard was born in Iran on July 27, 1960, to the union of Reza Bahrami and Bibi Zohdi.  (PSR ¶ 65.) Ms. Fard's father, Mr. Bahrami, passed away 1996 and her mother, Ms. Zohdi, age 96, currently resides with Ms. Fard. (PSR ¶ 65.) Ms. Fard also has five siblings, one of which is deceased. (PSR ¶ 66.)

 From age 10, Ms. Fard suffered physical abuse at the hands of her sister, Fatimeh. Ms. Fard reported Fatimeh hit Ms. Fard and pulled her hair. This occurred at least three times a week. (PSR ¶ 66.) Ms. Fard escaped the physical abuse by marrying Mahmood Kikalaye when she 16 years old. (PSR ¶ 67-68.) However, Ms. Fard's husband was also abusive. During the course of their marriage Ms. Fard's husband would physical abuse her on average 4 times a month. (PSR ¶ 70.) In fact, Ms. Fard was hospitalized six or seven times due stress. (PSR ¶ 70.) She divorced him in 1997. (PSR ¶ 69; TT 11/15/12, p. 22.)

Defendant's Sentencing Position Memorandum

Ms. Fard emigrated from Iran to the United States with one of her children when she was still a teenager. (PSR ¶ 69; TT 11/15/12, p. 17-19.) Ms. Fard's husband joined her later with her other children. (TT 11/15/12, p. 17-19.) After Ms. Fard divorced her husband, she was an unemployed student. (TT 11/15/12, p. 22-23.) And Ms. Fard's husband did not pay child/spousal support. (TT 11/15/12, p. 23.) Other than caring for her four children, Ms. Fard also cared for her mother and her father, when he visited the U.S. (TT 11/15/12, p. 24-25, 179.) At various times, Ms. Fard also cared for her brother, Ms. Bahramian and her children, and Ms. Bahramian's nephew. (TT 11/15/12, p. 28, 134.) Only Ms. Fard's father assisted her financially after her divorce. (TT 11/15/12, p. 25, 179.)

However, Ms. Fard did not only care for her family, she also cared for individuals she did not know. Orangh Haghighi described how Ms. Fard cared for his older brother whom she did not have a relationship with when he was hospitalized.  Ms. Fard also played a positive role in the post-hospitalization recovery by steering Mr. Haghighi's brother on a spiritual path. (*See* Exhibit A—Character letters from friends and family, at p. 4.) Ms. Fard has been described by many as spiritual, warm, compassionate and highly altruistic individual, who seeks to help family, friends and neighbors alike with money, food, advice, and kindness.  In fact, Ms. Erica Parast stated that Ms. Fard saved her life by helping her cope with her past history of abuse. (*Id.* at p. 10.) Her absence will be felt strongly in her community and family. (Exh. A.)

Currently, Ms. Fard cares for her severely ill mother, who requires around the clock care. Dr. Rodriguez verified that Ms. Fard's mother requires 24-hour care by Ms. Fard. (*See* Exhibit B—letter from G. Rodriguez.) Another physician attending to Ms. Fard's mother, Dr. Douglas Kiester, also stated that Ms. Fard is a full time caregiver for her mother. He stated that Ms.

Defendant's Sentencing Position Memorandum

Fard's mother is very frail and has mental rationality problems. Ms. Fard's mother panics when Ms. Fard is not around and does not accept food or medicine from other family members as she does not recognize them. (*See* Exhibit C—letter from D. Kiester.)  Ms. Fard's sisters also stated that their mother suffers from significant physical issues, as well as paranoia and severe anxiety and does not allow anyone else to care for her. (Exh. A at p. 3.)

*Employment and Education*

Ms. Fard obtained her Bacherlor's degree in Psychology from University of California at Irvine in 1986. (PSR ¶ 104.) She then obtained a Master's degree in Psychology from Newport University in 1988. (PSR ¶ 103.) Ms. Fard continued her education and received a Ph.D. in Clinical Psychology also from Newport University in 1990. (PSR ¶ 102.) Although Ms. Fard wanted to practice as a clinical psychologist, she never obtained licensure. (PSR ¶ 109.) Additionally, Ms. Fard attended various seminars and continuing education courses. (PSR ¶ 105-107.) Ms. Fard holds a second-hand jewelry sales license. (PSR ¶ 108.)

From approximately 1998, Ms. Fard has operated Leisure World Estate Jewelry. (PSR ¶ 113.) In the past, Ms. Fard also operated Belvedere Jewelry and rented her properties for short vacation rentals. She also was involved with World Discovery Corporation and Las Vegas property Management. (PSR ¶ 114-115.) Ms. Fard is no longer involved with the aforementioned ventures except Leisure World Estate Jewelry on a limited basis.

Currently, Ms. Fard operates No More Pain. No More Pain engages in consulting for individuals afflicted with psychosomatic pain, and others similarly afflicted. Ms. Fard sees a lot of her clients on a pro bono basis. In the past, Ms. Fard also volunteered with an organization that works with

Defendant's Sentencing Position Memorandum

human trafficking victims. Those who know Ms. Fard in her professional capacity describe her as professional, ethical, and moral. (Exh. A at p. 8-9.)

Ms. Fard volunteers her time to help abused women and girls through the Bella Luna Educational Foundation. She is on the board of directors and helps as a consultant to counsel women battle abuse. Erica Parast has praised Ms. Fard and commended her for being an asset to the community and a positive role model for women. (Exh. A at p. 10)

### *Mental and Physical Condition*

Ms. Fard has a lump in her throat that may be cancerous. (PSR ¶ 92.) Ms. Fard also suffers from asthma, double vision, numbness, and tingling in her left hand and leg, limited range of motion in her left arm, chronic ear ache. (PSR ¶ 92.) It is likely that once an excisional biopsy is performed, the pathology report will show either papillary carcinoma of the thyroid or follicular carcinoma of the thyroid. (*See* Exhibit D—Medical documents.) Ms. Fard also suffers from anxiety and panic attacks. (PSR ¶ 96.)

### *Substance Abuse*

Ms. Fard does not suffer from substance abuse issues. She currently does not drink alcohol. (PSR ¶ 99-100.)

### D.   Seriousness of the Offense, Respect for the Law, And Just Punishment

The need for retribution is measured by the degree of "blameworthiness," which "is generally assessed according to two kinds of elements:  the nature and seriousness of the harm caused or threatened by the crime; and the offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense,

and mental illness or other diminished capacity." Richard S. Frase, Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?, 89 Minn. L. Rev. 571, 590 (February 2005). The guidelines include none of the factors bearing on Ms. Fard's degree of culpability.

Under 18 U.S.C. §3553(a)(2)(A), the sentenced proposed by the defense is just and will promote respect for the law. No institution suffered a loss due to fraudulent loans. Without the intervention of Mina Azariani, the Washington Mutual broker who encouraged the "serial" refinancing due to expiring teaser rates, it is likely this conduct would not have occurred. Ms. Fard does not intend to shift blame to Ms. Azarani but merely request this court note the vulnerability of Ms. Fard, an immigrant woman with four children and ailing parents, who sought to provide for all of her family. The fact that Ms. Azarani spoke Farsi and was well respected in the Persian community for brokering loans, along with the booming housing market and WAMU's unfair lending practices together created an environment in which Ms. Fard found herself but did not seek out. Ms. Fard sought a long term fixed rate mortgage from Ms. Azaraini which would have discouraged the constant refinancing associated with the adjustable teaser rates offered by WAMU.

When Ms. Fard was indicted she surrendered herself to the Marshal's and appeared in custody at her initial appearance. For five years Ms. Fard has been released on bond without one misstep and fully cooperated with her pre-trial release conditions. Ms. Fard has not committed any new law violations since being indicted and her only prior conviction is for parking in a handicap space with a placard while her disabled mother was not in the vehicle in 2004.

Defendant's Sentencing Position Memorandum

Ms. Fard works with women suffering from severe emotional disturbances, often on a volunteer basis. Ms. Fard has been caring for her family, especially her gravely ill mother. A sentence of probation and home confinement will impose serious restrictions on Ms. Fard yet allow her to care for her elderly, ailing mother and to maintain some source of income so that she may be better equipped to repay any taxes ordered by the court.

Ms. Fard has lived a law-abiding life until the instant offense began in her 40's. She was an active member of the community and a dedicated daughter and mother. Her offense is completely uncharacteristic when viewed in the context of her entire productive adult life. This Court should grant a variance based on the aberrant nature of her conduct. *See*, e.g., *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (variance based on "isolated mistake" in otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Davis*, 2008 WL 2329290 (S.D.N.Y. June 5, 2008) (defendant was a first offender who had worked throughout his 15-year marriage to educate his six children and whose offense was prompted by economic pressures).

**E.     Deterrence of Criminal Conduct**

18 U.S.C. 3553 (a)(2)(B) requires the Court to consider a sentence that affords adequate deterrence. However, incarceration is not the sole method of affording deterrence in further criminal conduct. United *States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010.) In fact, legislative history points out that deterrence can be accomplished through probation in appropriate cases. *Id*. citing S. Rep. No. 98-225.

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of

Defendant's Sentencing Position Memorandum

punishments do not yield significant (if any) marginal deterrent effects."
Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28
(2006) (Tonry). Typical of the findings on general deterrence are those of the
Institute of Criminology at Cambridge University. *See* Andrew von Hirsch et
al., Criminal Deterrence and Sentence Severity: An Analysis of Recent
Research (1999). The report, commissioned by the British Home Office,
examined penalties in the United States as well as several European
countries. Tonry, *supra*, at 1. It examined the effects of changes to both the
certainty and severity of punishment. Id.  While significant correlations were
found between the certainty of punishment and crime rates, the "correlations
between sentence severity and crime rates...were not sufficient to achieve
statistical significance." *Id*. at 2. The report concluded that "the studies
reviewed do not provide a basis for inferring that increasing the severity of
sentences is capable of enhancing deterrent effects." *Id*. at 1.

Research regarding white collar offenders in particular (presumably
the most rational of potential offenders) found no difference in the deterrent
effect of probation and that of imprisonment. *See* David Weisburd et al.,
Specific Deterrence in a Sample of Offenders Convicted of White Collar
Crimes, 33 Criminology 587 (1995); ("[T]here is no decisive evidence to
support the conclusion that harsh sentences actually have a general and
specific deterrent effect on potential white-collar offenders."). According to
"the best available evidence,...prisons do not reduce recidivism more than
noncustodial  sanctions." Francis T. Cullen et al., Prisons Do Not Reduce
Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S
(2011) Here, a sentence of probation and home confinement would deter Ms.
Fard from any further criminal conduct as she will face possible
imprisonment if she violates the terms and conditions of her confinement
and supervised release or commits any new law violation.

## F.      Need to Protect the Public

Under 18 U.S.C. § 3553(a) (2) (B), the Court is to consider the structure of a sentence to be imposed and how it will ensure the protection of the public. Based on her unwavering compliance with pretrial release, there is no indication that Ms. Fard is a continued threat to the community. Ms. Fard has been in the community for over 5 years since indicted. She has not engaged in any illegal conduct and has not been charged with any new law violations. Instead, Ms. Fard has been a productive member of her community. She has been working diligently on her small business and helping others in the community. Ms. Fard has been caring for her elderly mother who is under constant medical care, and requires a caregiver around the clock. Therefore, a sentence of probation or home confinement meets this concern.

*Ms. Fard has an exceptionally low risk of recidivism.*

Ms. Fard is a 52-year-old mother of four, a first offender, a college graduate who also obtained a post-graduate degree, was employed throughout her adult life, was married, and has no history of drug or alcohol abuse. In addition, since the end of the alleged time frame (2006), Ms. Fard has remained out of custody and crime free. She is at an extremely low risk of recidivism.

For those over age 50 at the time of sentencing, the recidivism rate in Category I is only 6.2%. For those who are college graduates, the rate in CHC I is just 7.1%; for those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half that of those who do have a drug history. For those who like Ms. Fard are in Category I, educated, have been employed, have been married, are drug free, and are over 50, the recidivism

rate is certainly much lower. *See* U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at Exh. 9, at 28; Exh. 10, at 29 (May 2004) [hereinafter Measuring Recidivism]. For all Category I defendants convicted of fraud, the recidivism rate is just 9.3%, the lowest of any offense category, which is 45% below the rate for all fraud offenders. *Id.*, Exh. 11, at 30.

Finally, offenders like Ms. Fard with zero criminal history points have a rate of recidivism half that of offenders with one criminal history point. *See* Sent'g Comm'n, Recidivism and the "First Offender," at 13-14 (May 2004) [hereinafter First Offender]. The Commission has recognized the advisability of revising the guidelines to take age and first offender status into account. *See* First Offender at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure"); Measuring Recidivism at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation"). The Commission has not implemented any such revisions to the criminal history guidelines, but has recently stated that age "may be relevant" in granting a departure. USSG §5H1.1, p.s.

In imposing the least sentence sufficient to account for the need to protect the public from further crimes of Ms. Fard, this Court should consider the statistically low risk of recidivism presented by Ms. Fard's history and characteristics. *See United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Hamilton*, 323 Fed. Appx. 27, 31 (2d Cir. 2009) ("the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt*, 486 F.3d 997, 1004 (7th Cir. 2007)

(affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a violent crime); *United States v. Urbina*, slip op., 2009 WL 565485, *3 (E.D. Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"); *Simon v. United States*, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005) (basing variance in part on defendant's age of 50 upon release because recidivism drops substantially with age); *United States v. Nellum*, 2005 WL 300073 at *3 (N.D. Ind. Feb. 3, 2005) (granting variance to 57-year-old defendant because recidivism drops with age); *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993) (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first offense). Because of Ms. Fard's extremely low probability of recidivism, this court should grant a sentence of probation and home confinement.

## G.    Prospect for Rehabilitation

Under 18 U.S.C. Section 3553(a) (2) (D), the court should fashion a sentence to provide Ms. Fard needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. Ms. Fard has already shown her amenability to rehabilitation by her crime free lifestyle, her devotion to her family and her commitment to working with those suffering in the community.

///

///

///

**H.     Available Sentences in this Case**

This Court must now consider all of "the kinds of sentences available" by statute, §3553(a)(3), even if the "kinds of sentence...established [by] the guidelines" zones recommend only a lengthy prison term. *See Gall*, 552 U.S. at 59 & n.11. Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. §994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Ms. Fard is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."

The available sentences in this case under the advisory guidelines include a term of probation and home confinement which is appropriate here.

**I.     The Need to Avoid Sentence Disparities**

Pursuant to section 3553 (a)(8), the Court is instructed to consider as a factor the need to avoid unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct. The

Court has discretion to depart or vary from the sentence that would result for a strict application of the United States Guidelines.

The court should avoid unwarranted similarities in sentencing among defendants who are different in ways not accounted for in the guideline range, *See Gall v. United States*, 552 U.S. 38, 55 (2007) ("need to avoid unwarranted similarities among other co-conspirators who were not similarly situated"); *United States v. Ovid*, 2010 WL 3940724 (E.D.N.Y. 2010) (sentencing two defendants with similar guideline ranges to 60 months and 126 months respectively based on distinctions in circumstances of the offenses and characteristics of the defendants), and unwarranted differences among defendants whose conduct and characteristics are similar. *See United States v. Parris* (*Paris*), 573 F. Supp. 2d 744, 753, 756-62 (E.D.N.Y. 2008).

In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases; 23.7% were government-sponsored, 23.8% were non-government sponsored. *See* U.S. Sent'g Comm'n, 2012 Sourcebook of Federal Sentencing Statistics, tbl.27. This Court should take into account the national sentencing trend exemplified by the Commission's data and this chart.

In addition, the court should take into account the sentence of the defendant's co-conspirators. In this case, Ms. Fard's co-defendants Sedigheh Bahramian, Mohsen Kikalaye, and Ahmad Kikalaye were sentenced to one day of custody each. Ms. Bahramian was convicted of bank fraud [18 U.S.C. 1344, counts 1 and 2 of superseding information] on July 12, 2010 and was sentenced to 1 day in custody and three years of supervised release. (PSR ¶ 7.) She admitted to purchasing properties, obtaining a mortgage loan in the sum of $1.4 million, filling out false loan documents overstating her income,

Defendant's Sentencing Position Memorandum

and failure to file tax returns reflecting property sales or claim capital gains. [Dkt. 106, p. 4; Dkt 224, p. 22-23.]

On August 9, 2010, Mohsen Kikalaye was convicted of bank fraud [18 U.S.C. 1344, count 1 of superseding information] and sentenced to 1 day in custody 3 years of supervised release. (PSR ¶ 8.) Mohsen admitted to obtaining multiple mortgages loan in the amount of $980,000 from WAMU in order to purchase 2314 W. Oceanfront on July 26, 2000 with a loan application in which he knowingly provided false information overstating his income. [Dkt. 94, p. 3-4; Dkt. 225, p. 21-22.]

On July 21, 2010, Ahmad Kikalaye was convicted of bank fraud [18 U.S.C. 1344, counts 3 and 4 of first superseding information] and sentenced to 1 day in custody and 3 years of supervised release. (PSR ¶ 9.) Ahmad admitted that he obtained multiple mortgage loans from WAMU by submitting false information. [Dkt. 95, p. 4; Dkt. 208, p. 20-21.]

**J.     The Need to Provide Restitution in this Case**

Because WAMU was paid in full and the taxes are owed to the government, Ms. Fard does not owe any restitution in this case.

## VI.

### A Variance is Warranted in this Case.

Since the Commission has not corrected the problem of multiple overlapping enhancements, many courts have recognized that a departure or variance is warranted to avoid it. *See*, e.g., *United States v. Lauersen*, 362 F.3d 160, 164 (2d Cir. 2004) (subsequently vacated in light of Booker) (upholding departure to mitigate effect of "substantially overlapping enhancements" at the high end of the fraud sentencing table); *Parris*, *supra*, at 745 (guidelines in security fraud cases "are patently absurd on their face"

Defendant's Sentencing Position Memorandum

due to the "piling on of points" under § 2B1.1); *United States v. Adelson*, 441 F. Supp. 2d 506, 510 (S.D.N.Y. 2006) (guidelines in fraud cases have "so run amok that they are patently absurd on their face," and describing enhancement for "250 victims or more," along with others, as "represent[ing], instead, the kind of 'piling-on' of points for which the guidelines have frequently been criticized").

In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases; 23.7% were government-sponsored, 23.8% were non-government sponsored. *See* U.S. Sent'g Comm'n, 2012 Sourcebook of Federal Sentencing Statistics, tbl.27. "[I]t is difficult for a sentencing judge to place much stock in a guidelines range that does not provide realistic guidance," *Parris*, *supra*, at 751; *See* also *United States v. Watt*, 707 F. Supp. 2d 149 (D. Mass. 2010) (The "Guidelines were of no help."). "[S]ince *Booker*, virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines for cases like these and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives." Frank O. Bowman III, Sentencing High-Loss Corporate Insider Frauds After *Booker*, 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

A variance is necessary to do justice in this case, and will also contribute to the evolution of responsible guidelines. As the Supreme Court emphasized, when judges articulate reasons for sentences outside the guideline range, they provide "relevant information to both the court of appeals and ultimately the Sentencing Commission," which "should help the

Guidelines constructively evolve over time, as both Congress and the Commission foresaw." *Rita*, 551 U.S. at 357-58.

## VII.
### THE MINIMALLY-SUFFICIENT SENTENCE IN THE CASE

As discussed above, *Booker* and Title 18 of the United States Code Section 3553(a) factors state that a sentence must be "sufficient, but not greater than necessary" to achieve the purposes of punishment

Ms. Fard respectfully requests that this Court impose a sentence of no more than probation and home confinement. Ms. Fard respectfully submits that such a sentence will be sufficient to achieve the goals of punishment and justice.

Ms. Fard recognizes that the seriousness of her offense and the resulting harm warrants punishment; she is not attempting to avoid or hide from this reality. Any period of confinement over that of home confinement would be a substantial term for Ms. Fard and her family, specifically her mother, under these circumstances. The proposed sentence achieves the goals of deterrence, incapacitation, and rehabilitation. In determining the minimally sufficient sentence, the Court must essentially ask whether a more severe sentence achieves a greater level of justice, deterrence and rehabilitation. Respectfully, Mrs. Fard submits that a greater sentence would not achieve such a goal.

///
///
///

Defendant's Sentencing Position Memorandum

# VIII.

## CONCLUSION

In light of the foregoing and the records before the Court, it is respectfully requested that the Court consider the evidence at trial, the calculation of the criminal history as outlined in the PSR, the Government's Position with Respect to Sentencing, this Defendant's Sentencing Memorandum, and to impose a sentence that reflects Ms. Fard's conduct after a full analysis of the sentencing factors permitted by law. In this regard, Ms. Fard requests that this Court sentence her to probation, a period of home confinement if necessary, and three years of supervised release.

DATED:  April 30, 2013                      Respectfully submitted,

                                            FERRENTINO & ASSOCIATES, INC.


                                            s/Correen Ferrentino
                                            Correen Ferrentino
                                            Karren Kenney
                                            *Attorneys for Defendant Fard*

Defendant's Sentencing Position Memorandum

# **CERTIFICATE OF SERVICE**

I, Correen Ferrentino, declare:

That I am a citizen of the United States and resident or employed in Orange County, California; that my business address is 600 W. Santa Ana Blvd, Suite 935, Santa Ana, Ca 92701; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That on April 30, 2013, I caused to be transmitted via facsimile to the person(s) below the **DEFENDANT'S MEMORANDUM AND POSITION REGARDING SENTENCING.**


**Robert Kelpa, USPO                                                emailed**
**United States Probation Department**
**United States Courthouse**
**600 U.S. Courthouse**
**312 Spring Street**
**Los Angeles, Ca. 90012**


This Certificate is executed on April 30, 2013 at Santa Ana, California. I certify under penalty of perjury that the foregoing is true and correct.

April 30, 2013                                        s/Correen Ferrentino
                                                           Correen Ferrentino

i